UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LARRY DANCY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:19-cv-00426-JRS-DLP ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Larry Dancy is a federal prisoner suing the United States for negligence under the Federal Tort Claims Act. One day for breakfast, he was fed cereal and milk that was contaminated with rodent droppings. Over the next five days, he experienced nausea, abdominal pain, sweating, vomiting, diarrhea, and stomach cramps.

The United States has moved for summary judgment. The sole issue is whether the evidence supports a reasonable conclusion that ingesting rodent droppings made him sick. Viewed in the light most favorable to Mr. Dancy, the evidence would allow a reasonable factfinder to conclude that eating rodent droppings made Mr. Dancy sick. His symptoms were consistent with a salmonella infection, and there is no evidence that his illness had an alternative source. The United States has submitted an expert report that opines Mr. Dancy's illness was not caused by ingesting rodent droppings, but the factual basis for that opinion relies on disputed facts that the Court must view in favor of Mr. Dancy at this stage of the proceedings. Accordingly, the United States' motion for summary judgment is **DENIED**.

**I. SUMMARY JUDGMENT STANDARD**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no

genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## II. BACKGROUND

### A. Rodent Droppings and Illness

Mr. Dancy was an inmate at USP Terre Haute. One morning, he was served a breakfast tray with cereal, milk, and cake. Dkt. 87-1, p. 24. He poured the milk in his cereal and started eating. *Id.* As he chewed, he noticed something crunchy. *Id.* At first, he thought the crunchiness came from the cereal. *Id.* But when he looked down, he saw rodent droppings floating in the milk at the top of the bowl. *Id.* at 25.

Mr. Dancy called Officer Robertson over to his cell and showed him the rodent droppings. *Id.* at 40. Officer Robertson agreed that the cereal and milk were contaminated, and he replaced the breakfast trays for Mr. Dancy and the other inmates on the range. *Id.* at 40, 43.

Mr. Dancy did not resume his breakfast when he received his new tray. *Id.* at 43. Instead, he induced vomiting to purge the rodent droppings from his stomach. *Id.* at 29-30.

Later that day, Mr. Dancy began to feel ill. He experienced nausea, vomiting, diarrhea, sweating, abdominal pain, and stomach cramps. *Id.* at 30-31, 43-45; dkt. 87-3, p. 33.

The next day, Mr. Dancy was examined by the medical staff. Dkt. 87-1, pp. 43-44; dkt. 87-3, pp. 33-34. He did not have stomach cramps, or abdominal pain during the examination, but he told the nurse about his ongoing vomiting and diarrhea. *Id.* He remained sick for about five days, with "pain back and forth," and he felt "a little woozy" a few days after that. Dkt. 87-1, pp. 31, 45. His temperature was taken periodically by the nursing staff over the next two weeks, but those visits do not appear in his medical records. Dkt. 87-2, para. 8; *see generally* dkt. 87-3.

Mr. Dancy had an optometry appointment on June 12 and a psychology appointment on June 13. Dkt. 87-3, pp. 36-37, 208. He was able to complete these appointments, but his medical records from these appointments do not indicate whether he had any subjective symptoms of gastrointestinal illness or suggest that his psychologist or optometrist conducted any physical exams relating to gastrointestinal distress. *Id.*

Mr. Dancy's next documented medical exam was on June 18, at his illness had passed on its own. Dkt. 87-1, p. 99; dkt. 87-3, p. 32.

**B. Expert Report**

The United States has submitted an expert report from Dr. Aniruddha Hazra. Dkt. 87-5. Dr. Hazra opines that Mr. Dancy's illness was "unlikely to be caused by a foodborne illness from consuming rodent feces. His immediate symptoms after ingestion are not consistent with an incubation period of a rodent-borne infectious pathogen. Mr. Dancy's reported illness several days after the incident could be consistent with Salmonellosis, however, the lack of subjective symptoms or physical exam findings argues against this diagnosis." *Id.* at 3.

3

Dr. Hazra states the following about the symptoms, incubation period, and recovery time for salmonella infections:

> Salmonella infections can spread through ingestion or direct contact with rodent urine or droppings of an infected animal. The incubation period for salmonellosis is usually 6-72 hours followed by gastrointestinal symptoms including diarrhea (at times bloody), abdominal pain, rash, nausea, and vomiting.

*Id.*

Dr. Hazra based his expert opinion on his review of Mr. Dancy's amended complaint, the packet for his administrative tort claim, his initial disclosures, and his medical records. *Id.* at 1. Dr. Hazra did not have the benefit of reviewing Mr. Dancy's deposition transcript.

### III. DISCUSSION

#### A.  Tort Standard

The Federal Tort Claims Act is a limited waiver of the United States' sovereign immunity that "permits suits against the United States for personal injuries caused by the wrongful acts of federal employees acting within the scope of their employment under circumstances in which a private person would be liable to the plaintiff." *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)). The Federal Tort Claims Act incorporates the substantive law of the state where the allegedly tortious act or omission occurred. *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991); 28 U.S.C. § 1346(b)(1). Thus, Indiana tort law is the substantive law in this case.

To prevail on an Indiana toxic tort claim, Mr. Dancy must show (1) that he was fed rodent droppings; (2) that he became ill; (3) that eating rodent droppings could have caused his illness (general causation); and (4) that eating rodent droppings in fact caused his illness (specific causation). *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015).

**B. Analysis**

The United States' sole argument on summary judgment is that feeding Mr. Dancy rodent droppings did not and could not have made him sick. *See* dkt. 88, p. 11 n. 1. The United States argues that Mr. Dancy's claim must be dismissed because he has not hired an expert witness and that expert testimony is required to prove general and specific causation. *Id.* at 11.

The Court does not agree that Mr. Dancy's claim fails as a matter of law because he did not hire an expert witness. Toxic tort claims often require some expert testimony. *See Textron, Inc.*, 807 F.3d at 838. But that evidence does not necessarily have to come from the plaintiff. *See Gupta v. Melloh*, 19 F.4th 990, 998 (7th Cir. 2021) ("Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the non-moving party. Sometimes the facts taken in the light most favorable to the non-moving party come from the party moving for summary judgment or from other sources.").

In this case, the United States has submitted an expert report from Dr. Hazra. The Court will consider whether Dr. Hazra's expert opinion, considered in light of Mr. Dancy's deposition, supports a reasonable inference that Mr. Dancy's illness could have been caused by eating rodent droppings (general causation), and that his illness was in fact caused by eating rodent droppings (specific causation).[1]

---

[1] The Court will also consider non-controversial medical information from the Centers for Disease Control and Prevention. *Rowe v. Gibson*, 798 F.3d 622, 629 (7th Cir. 2015) (reversing summary judgment based on appellate court's judicial notice of highly reputable medical websites).

According to the Centers for Disease Control and Prevention ("CDC"), "Food is the source for most [salmonella] infections." Other sources include handling animals and changing diapers. Most people recover without specific treatments, and antibiotics are not recommended. Symptoms typically include diarrhea, fever, stomach cramps, nausea, vomiting, or headaches. Symptoms usually begin in six to seventy-two hours and last four to seven days. https://www.cdc.gov/salmonella/index.html (last visited March 23, 2022).

### 1. General Causation

Salmonella is a common foodborne illness that can be caused by ingesting rodent droppings. People typically develop symptoms within six to seventy-two hours, and the symptoms last about four to seven days. Symptoms may include nausea, vomiting, diarrhea, stomach cramps, abdominal pain, fever, headaches, and a rash. The illness usually passes without medication or hospitalization. *Supra* at Part II-B; p. 5 n. 1.

It is undisputed that Mr. Dancy was fed rodent droppings, a common cause of salmonella. He then experienced several common symptoms of salmonella, including nausea, diarrhea, vomiting, abdominal pain, and stomach cramps. Dkt. 87-1, pp. 31, 43-46; dkt. 87-3, pp. 33-34. The onset of these symptoms later that day and the timing of Mr. Dancy's recovery about five days later are consistent with a salmonella infection. *Id.*; dkt. 87-5, p. 3; *supra*, p. 5 n. 1.

The United States argues that Dr. Hazra's report defeats general causation as a matter of law because "the undisputed expert testimony shows that rodent feces does not cause *the types of symptoms* Plaintiff claims to have experienced." Dkt. 88, p. 12 (emphasis added). But according to Dr. Hazra, common symptoms of salmonella include diarrhea, abdominal pain, rash, nausea, and vomiting—all of which Mr. Dancy experienced after ingesting rodent dropping in his cereal, with the exception of a rash. Dkt. 87-5, p. 3. His other symptoms, such as headaches and stomach cramps, are also common symptoms of salmonella according to the CDC. *Supra* p. 5 n. 1. Although he did not diagnose Mr. Dancy with salmonella, Dr. Hazra stated, "Mr. Dancy's reported illness several days after the incident could be consistent with Salmonellosis," Dkt. 87-5, p. 3. Thus, the United States' argument that the *types of symptoms* Mr. Dancy experienced are inconsistent with illnesses contracted from ingesting rodent droppings appears to be contradicted by the CDC as well as their own expert.

Taken together, the evidence supports a reasonable inference that Mr. Dancy's symptoms could have been caused by ingesting rodent droppings. In the next section, the Court will consider whether there is evidence to support a reasonable conclusion that his symptoms were in fact caused by ingesting rodent droppings.

### 2. Specific Causation

In this case, a reasonable factfinder could conclude that Mr. Dancy's symptoms were caused by ingesting rodent droppings. The symptoms he experienced, the onset of his illness, and the timing of his recovery are consistent with this conclusion, and there is no evidence that any other source might have made him sick. Salmonella is most often contracted by eating contaminated food, and other common causes of salmonella (e.g., handing animals and changing diapers) did not occur during the time relevant to Mr. Dancy's illness. *Cf. Myers v. Illinois Central Railroad Co.*, 629 F.3d 639, 643 (7th Cir. 2010); *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 389 (Ind. Ct. App. 2006) (expert testimony is not required in toxic tort cases if the specific cause of the plaintiff's illness is obvious).

Dr. Hazra also opines that Mr. Dancy's illness was unrelated to ingesting rodent droppings because Mr. Dancy vomited immediately after consuming rodent feces. Dkt. 87-5, p. 3. But there is a factual dispute underlying this opinion. Mr. Dancy testified in his deposition that he induced vomiting immediately after eating rodent droppings in an attempt to pump his own stomach. Dkt. 87-1, p. 25. Dr. Hazra did not have the benefit of reviewing Mr. Dancy's deposition transcript and presumed that Mr. Dancy had claimed that this episode of vomiting was caused by ingesting rodent droppings. There is a reasonable probability that Dr. Hazra's opinion would be different if he was informed that Mr. Dancy induced vomiting immediately after ingesting rodent droppings, and that his symptoms of nausea and vomitting began later that day.

Dr. Hazra also based his opinion on the lack of subjective symptoms and physical exam findings at subsequent clinical encounters. The only documented clinical encounter during the time of Mr. Dancy's illness that references his gastrointestinal distress was an appointment with a nurse on June 12, at which Mr. Dancy stated he was continuing to experience diarrhea and vomiting. Dkt. 87-3, pp. 33-34. Contrary to a statement in Dr. Hazra's report, this medical record does not state that Mr. Dancy was no longer experiencing nausea. *Id.*; *see* dkt. 87-5, p. 1 ("While he reported cramping earlier, he did not have any abdominal pain or nausea at the time of this visit.").

Mr. Dancy had an optometry appointment on June 12 and a psychology appointment on June 13, but his medical records from these appointments are silent as to whether he had any subjective symptoms of gastrointestinal illness, and there is no indication that his optometrist or psychologist examined him for that illness. Dkt. 87-3, pp. 36-37, 208. By the time of his next documented clinical encounter with the nursing staff on June 18, Mr. Dancy's gastrointestinal distress had passed on its own, which is consistent with the Centers for Disease Control and Prevention's projected recovery time for salmonella. *Supra*, p. 5 n. 1.

The United States relies on toxic tort cases where summary judgment was granted for the defendant, but these cases are distinguishable. In *G.M. v. PetSmart, Inc.*, the plaintiff sued a pet store after he developed rat bite fever. 127 F.Supp.3d 960 (S.D. Ind. 2015). The Court granted summary judgment for the defendant because there was no expert testimony on the element of specific causation, *i.e.*, that the plaintiff's rat bite caused him to develop rat bite fever. *Id.* at 693. But in that case, there was another potential source of the plaintiff's illness. The plaintiff had been "bitten by a tick at or around the time he contracted rat bite fever," and an expert testified that tick bites are a common cause of rat bite fever. *Id.* The Court granted summary judgment because there

8

was no expert testimony that the rat bite made the plaintiff sick *and because* there were alternative sources that could have made him sick just as easily.

In *James Jones v. United States*, a federal prisoner claimed that his *H. pylori* infection was caused by drinking contaminated water at his prison. Case No. 2:16-cv-435-JRS-DLP, 2019 WL 367622 (S.D. Ind. Jan. 30, 2019). But in that case, there was "no evidence that [the plaintiff] was actually exposed to *H. pylori*" at his prison. *Id.* *16. Also, an expert opined that the plaintiff most likely contracted *H. Pylori* in childhood and that the infection remained "silent" until he developed symptoms during his incarceration. *Id.* at *11. Thus, there was evidence of least one alternative source of the infection, and no evidence that the infection could have been caused by the prison's drinking water. In this case, there is no question that Mr. Dancy was fed rodent droppings, his symptoms were consistent with an illness caused by eating rodent droppings, and there is no alternative explanation for his illness.

In *Mark Jones v. United States*, a federal prisoner claimed he was harmed by exposure to lead, mold, and other contaminants. Case No. 2:17-cv-451-WTL-DLP, 2019 WL 2647593 (S.D. Ind. June 27, 2019). Like the plaintiff in *James Jones*, there was no evidence that the plaintiff was ever exposed to toxic contaminants, nor was there evidence that he developed symptoms that could have been caused by those contaminants. *Id.* at *8 ("there is no evidence that Mr. Jones was ever exposed to, much less harmed by, lead paint" and "Mr. Jones' allegations about being harmed by mold and mildew in the shower stall were based on a brown toenail. There is no evidence reflecting that the mold or mildew was toxic or otherwise harmful.").

Viewed in the light most favorable to Mr. Dancy, the evidence supports a reasonable conclusion that Mr. Dancy developed a gastrointestinal illness from eating rat droppings. Accordingly, the United States' motion for summary judgment is **DENIED**.

## IV. Conclusion

The United States' motion for summary judgment, dkt. [87], is **Denied**. The Court will issue a scheduling order for the resolution of this action in due course.[2]

The Court previously denied Mr. Dancy's motions for assistance recruiting counsel. *See* dkts. 29, 80. Given the challenges inherent in late-stage litigation, these motions are reconsidered and **Granted**. The Court will attempt to recruit counsel on Mr. Dancy's behalf before trial.

**IT IS SO ORDERED**.

Date: 3/24/2022

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

LARRY DANCY
11622-007
COLEMAN - I USP
COLEMAN I U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 1033
COLEMAN, FL 33521

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
rachana.fischer@usdoj.gov

---

[2] In the opening and reply briefs, the United States discusses the adequacy of Mr. Dancy's medical treatment after he became sick. *E.*g., dkt. 88, p. 9, para. 28 (citing the original complaint at dkt. 1); dkt. 102, pp. 2-4. The Court clarifies that Mr. Dancy's amended complaint does not include a claim for medical negligence. Although he briefly mentions that he was told to drink water after he became sick, he does not allege that this treatment was inadequate. Dkt. 43, p. 3. The Court did not recognize a medical negligence claim in the order screening the amended complaint. Dkt. 51. Mr. Dancy's sole claim is that prison officials were negligent by feeding him cereal contaminated with rodent droppings.